If I can get myself semi-organized. That's all right. Take your time. Get your papers ready. All right. I would like to start with the second issue, if that, if nobody has an objection. That's the one where we argue that Mr. Sturdivant may have been convicted on a legal theory which is not sustainable. The indictment in this case charges false statements and representations to FEMA. And it goes on in there to say that he made false statements about how many trees were cut and how many trees were loaded onto trucks. So you have two areas of false statements that we're concerned with here. Now, the problem comes in because making false statements about whether or not the trees were loaded onto the trucks is, was not material to whether or not FEMA made payment. Why not? Why not? Because this was a contract that was based on the number of trees that were cut and their size. The number and the size. Just common sense tell you that you cannot put on a truck that many trees of that size. I mean, unless it's a huge truck of some sort I've never seen. It doesn't make a lot of sense. But they get paid according to the size of the tree. And when you get to those larger diameters, it goes up very fast in terms of compensation. So the charge tickets then happen to, it just happened that the trees that they were cutting had a large number of those larger trees. So that's one of the very basic common sense problems that I have with, you can get me with. Well, the trees, here's what happened. May I get some water? My voice is about to leave me. Take your time, it's fine. Yeah. What happened was you had some load tickets that were developed when this whole business started. And the initial contract was for the collection of cubic yard debris, which was clearing the immediate stuff that could be loaded onto trucks. And so what happened is the FEMA man, Mr. Roberts, got together with the local man, Mr. Clark, and the head of the Board of Supervisors, Fred Andrews. And they developed this ticket. And the ticket had on there, the way they kept up with the cubic yard debris was that they would load the material on the truck. And they had the measurement of how much capacity the truck had. And then they would haul it to the dump where they had monitors there who would check the amount. Well, when they did the second contract, they carried that over onto the load ticket. They didn't change the load ticket. So the trees were not required to be loaded on a specific truck. So it didn't matter whether they were put on that truck. All that mattered was the tree cut and what was the size of the tree. So it had no relationship on this second contract to whether or not it could be loaded on the truck. In fact, Mr. Sturman, the father, owned a wood yard. And quite a number of these trees, particularly the larger ones, were hauled to the wood yard to be cut into lumber and so forth. So that's where the confusion comes in. And the government argued very forcefully throughout the trial. As I recall, you have trial testimony that the workers out there cutting these trees and so forth, they were passing out cash, several thousands of dollars being paid to one or the other. And can you account for those payments of anything other than a perpetuation of fraud? I'm not sure what testimony you're talking about. Now, there was the testimony from Judge Johnston that he was paid. But other than Judge Johnston, I don't recall any testimony.  Well, he was actually doing work that he shouldn't have been doing and getting paid. He was driving a truck. He was helping with the cutting. He was going and getting supplies. He was cooking. And so there were several things that he was doing that he got paid for that probably was a conflict of interest. And so the—but that was not, at least according to the discernment people and the trial people, that was not a payment to inflate the tickets. How much did they pay him? He deposited approximately $20,000. He says he was paid somewhere between $30,000 and $40,000. But the deposits of cash, the only—he had the amounts—he had deposits of those amounts over the course of a period of time. And then he had $1,000 that Brent paid him that in the conversations that were recorded, they talk about—he talked—Brent talks about it being a loan. And then there was a $4,000 check from Sturdivant's account in, I think it was 2007, that was supposedly for the payment of a buggy that Johnson's wife said she never sold him a buggy. So that's—those are the amounts that were there. Now, the problem, of course, is that if he was convicted for contract violations, in other words, not loading the trees onto a particular truck, and we can't tell whether he was or not because the verdict was general, and the government argued that lying about putting the trees on the trucks was a false statement to FEMA, then if that is not a crime, then according to the case law, we have to reverse the sentence at the conviction. I'm trying to follow this argument, and maybe it's just still early, but I thought the evidence about the trees, cut the size of the trees and whether or not they would fit onto the truck, went to the fraud with regard to the charge tickets that got submitted, which is to say, I thought the government's contention was you just couldn't have cut that many trees and limbs based on the size of these trucks, and what would have been hauled away by the trucks couldn't have been as many as you billed for. Was that their argument? Yeah, that was their argument, but if you haul— But hold on a second. So that's the relevance of the size of the trees and the loading of the trees onto the trucks, isn't it? Well, let's assume for the sake of argument that it's relevant. It is—not loading the trees on the truck is not a crime because it was not material to the payment. But submitting a request for payment for trees and limbs that weren't cut at all is a crime. That would be a crime, but you see, we don't know whether he was convicted for submitting a load ticket for trees that were not cut or submitting a load ticket that—trees that were not cut or— But you're not complaining about jury instructions, are you? Well, there was no jury instruction that required them to make that distinction, which is one reason why we don't know what he was convicted of. So the answer to my question is there is no complaint about jury instruction. No, I complained about the jury instruction, but nobody objected to the jury instruction on that basis at trial. Let me rephrase. On appeal here before us— Well, my primary contention is the two bases for conviction. If one of them is not legally supportable and you can't tell from the verdict which one he was convicted of, then we're required to reverse. And you see, this is where—you see, we're all confused here. So the jury— I am now, but go ahead. The jury was, you know, bound to be confused. But, you see, you've got a contract that is— Let me bring it back to the record, whether this jury is going to be confused or not. There's a recorded statement from Sturtevant. He said to Johnson, The only way anybody's going to get in trouble is if somebody rats on somebody else to keep somebody else out of trouble. Look how much money they spent to catch us. If they want to get us, well, Lord, they could. They had some money that was coming back to them when somebody was going to jail. The only people that are really going down for this thing is going to be me. Honestly, Daddy ain't going to do it. He didn't have nothing to do with it. The only other person that might go would be you, Johnson. The Sturtevant—the direct testimony of Sturtevant paid Johnson, who was an inspector, who wasn't cutting trees or doing anything else, thousands of dollars for no benefit. Now, that's evidence before the jury. I don't see anything confusing about that. Seems pretty straightforward, doesn't it? Well, I assume you're probably reading from the government's brief on what he said. But the context of that—if you look at the context of those statements, they're talking about—I mean, they're talking about if anybody rats us out. They're talking about—he goes on to say, it's not that any of these people have done anything wrong. They're young, and if the FBI puts them under pressure, they're going to say things. And so he's worried that if the FBI goes to somebody and puts sufficient pressure on them to turn— The only other person that might go would be you, Johnson. Johnson's an inspector, and the only way—and he's being paid by the state or salary of some sort, and he's been taking thousands of dollars. Well, there's— It's hard to explain, isn't it? Well, he admits that he was getting paid for doing other work, a substantial amount of other work. He denied that initially. The jury didn't have to conclude that. It was a question of sufficiency. The jury heard all this. Well, that's on the sufficiency issue. But regardless of whether it was sufficient to convict on that basis, we don't know if the jury convicted for that. We don't know if the jury convicted because they didn't cut the trees or because the load ticket showed—because the number of trees didn't match up to the capacity of the truck. Now, that was a—that was in no way material to receiving any payment from FEMA so that if the jury convicted on that basis, then according to Supreme Court case law and case law from this court, because the verdict was general, it requires a reversal. And that's regardless of whether or not the evidence— Whether or not—that's only when there are flawed legal theories and not factual theories. Well, this is a flawed—to say that you can be convicted for a violation of a contract term or for something that was on a load ticket that was not material is a flawed legal theory. All right. You've saved time for rebuttal, Ms. Epps. Thank you. Mr. Cleveland? Good morning, Your Honors. James Cleveland for the government. Ms. Epps is really focusing on factual matters that were presented to the jury that Judge Jordan considered in both his Rule 29 ruling and his Rule 33 ruling. She challenges some of the government's proof, mainly the government's reliance on evidence that what was claimed on the load tickets exceeded the capacity of what could be carried. But this does not invalidate the conviction. It's simply a challenge to one source of the proof. It applies equally to both of the objects of the conspiracy. You had the false statement object and the conversion object, the 1001 and the 641. The jury was instructed on those elements. I can refer the Court to Record 3570 through 3575. Judge Jordan carefully went through the conspiracy elements. He carefully went through the subjective charges that were the objects of the conspiracy. So the jury was instructed consistently with the law of the circuit, with the pattern of instructions that this Court has recognized. So it's not a question of one object. This proof applies equally to both of the objects of the conspiracy. It's not a question of one object being valid and one not. She didn't get into this in her argument, but it's inherent in her argument, which is she says that this is just a contract violation. Any ambiguity about how trees were to be disposed of under the contract was fully explored at the trial, and it offered only one possible explanation of why what was listed on the load tickets exceeded the load value of the truck and the trailers that were used to haul the material, as Judge Higginbottom referred to. The proof showed the usual practice was for the loads to match the trucks listed on the tickets with the difference being accounted for by the fraud. There was proof that there were some small logs that were chipped. Some large ones ended up on log trucks. But this was the exception. The proof was that most of the material, most of the leaning trees and the hanging limbs ended up on the load trucks going to the dump site, which is what was consistent with the terms of the contract. So evidently it did not convince the jury that there were some other ways to dispose of the material, and that certainly did not account for the vast amount of material that didn't match up with what the load ticket showed. So you had some 11,000 trees that were listed on load tickets for the Sturtevant company that could never be validated. So even if a small amount you could account for by them being chipped or being picked up by log trucks, that simply would not make up for the fraud. These were made up out of whole cloth. Ms. Epps says, well, Judge Higginbottom asked about the payments. She said, well, that's just for Judd Johnston doing extra work. Well, that simply does not explain the large amounts that he was being paid. She says, well, this was just because of a conflict of interest. Well, that doesn't explain why the FBI was involved. Of course, you have the recordings that Judge Higginbottom also referred to, and they're very telling. Government Exhibit 18C refers to what Johnston should say and how that's going to be our defense. That's pages 24 and 25 of the exhibit quoted by Judge Jordan at page 855 of the record. The defendant says, the FBI is in this. The FBI is not in this because of some conflict of interest and little extra payments because somebody was driving a truck occasionally. The defendant says, he talks about what's going to happen if somebody rats somebody, rats on somebody. That's page 9 of Exhibit 19B. He goes on to say, the best thing to do is the stupid routine. They can't send you to jail for stupidity. That's going to be our ticket. That's pages 15 and 16 of the same transcript. Of course, there was a reference to antique buggy on a check on Exhibit 14 that the defendant paid to Teresa Johnston, the wife of Judge Johnston, the accomplice in the case. Of course, there are the bank statements that were offered at trial. There was just ample proof, ample sources of proof. There was not a problem with the legal theory. The government had two objects. There was not an objection ever made at trial that the government was proceeding on an invalid legal theory. There was ample proof. The jury evaluated it. Judge Jordan evaluated both his Rule 29 rulings and his Rule 33 rulings, and we ask this Court to sustain the conviction. Thank you, Mr. Cleveland. Ms. Epps, you've saved time for rebuttal. Well, I will point out I have other issues other than this one. While we're on this one, I cited the United States v. Southland Management Court case in my initial brief, which is an en banc case from this court, that was a false claims act thing where the owners of an apartment complex certified falsely that the property was safe and they, in turn, received government payments for whatever, rent payments. And the court found that as a matter of law, there were no false claims because the statement was not material for the payment. So regardless of whether or not this load ticket had the truck capacity on there, and I will point out that each and every one of the people who drafted this ticket said that that was not material and nobody followed it anyway. The trees were, there's plenty of testimony that the people who were cutting the trees were working ahead of the capacity of the trucks to haul them away. So what they did was they cut the trees, they put them on the side, and the trucks would come back and get them lighter and haul them off. And so their, the testimony is that they just were not loaded that way and nobody thought that that was important. The people who loaded the tickets, there's nobody from FEMA who is there saying whether or not they put them on a particular truck had anything whatsoever to do with how they were being paid. They were being paid by cutting the trees and the size of the tree. And what the monitors would do and what Judge Johnson even finally admitted that he did was that they would cut ahead, he would put down the number of trees on the ticket, and then the people would come back later and pick them up. So if this young man was convicted because he did not comply with some ambiguous term in a contract that nobody thought was important anyway and it didn't have anything to do with how he was being paid, then Griffin and Schnitzer both required that the case be reversed because there's no way to tell whether or not the jury convicted him of that. And so regardless of whether he could have been convicted for one thing, which is a legal argument as opposed to a factual argument, whether or not you can be convicted for violating a contract is a legal issue. And so it's not a factual issue. It's as a matter of law, he can't be convicted of that. So that if the jury did that, and they were certainly asked to do that repeatedly, and this court is being asked to affirm the case, at least in part on that basis, then that would be a violation of Griffin. Now the problem is that there was an objection to the relevancy of whether or not these trees were supposed to go on the trucks, but it was not made until after there was considerable testimony about whether the trees went on a particular truck or not. That was made during Wallace's testimony. The expert at the government had to calculate the tree volumes and testify that they wouldn't go on the truck. So we get into the problem of whether or not this is a plain error case or whether it was objected to sufficiently to raise it so that it gets a more favorable standard of review. But I think I've discussed plain error pretty thoroughly in the brief, and my time is out. All right. Thank you, Ms. Epps. The case is under submission.